*Note: Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

**ENTRY ORDER**

SUPREME COURT DOCKET NO. 2014-123

SEPTEMBER TERM, 2015

|  |  |  |
|---|---|---|
| In re J.P. | } | APPEALED FROM: |
|  | } |  |
|  | } | Superior Court, Chittenden Unit, |
|  | } | Criminal Division |
|  | } |  |
|  | } | DOCKET NO. 4362-11-10 Cncr |

Trial Judge: Brian J. Grearson

In the above-entitled cause, the Clerk will enter:

J.P. appeals from the trial court's March 2014 order that found him to be "a person in need of treatment" pursuant to 18 V.S.A. § 7101(17) and 13 V.S.A. § 4822, and ordered him to be committed to the custody of the Department of Mental Health for ninety days. That ninety-day period has since expired, and J.P. remained hospitalized pursuant to a different court order.[*] J.P. argues that this case is not moot, and that the evidence is insufficient to support the court's decision. We agree that this case is not moot, and we affirm the court's decision.

In November 2010, J.P. was charged with first-degree murder and kidnapping of Kathleen Smith; burglary of her residence; and aggravated operation of her vehicle without her consent. The court declared J.P. incompetent to stand trial in January 2014. This triggered a hearing to determine if J.P. should be involuntarily committed. See 13 V.S.A. §§ 4820(2), (4) (upon finding of incompetence to stand trial under 13 V.S.A. § 4817, court "shall hold a hearing to determine whether such person should be committed to the custody of the Commissioner of Mental Health").

Following a three-day hearing, the court determined that J.P. should be involuntarily committed for ninety days. It found as follows. Ms. Smith was discovered lying face down on

---

[*] Prior to the expiration of the ninety-day period, the State filed an application for continued treatment. The trial court granted the State's request in June 2014, maintaining J.P.'s hospitalization for one year. Because of differences in briefing schedules, we have already ruled on J.P.'s appeal of the court's June 2014 decision to continue his hospitalization. See In re J.P., No. 2014-294, 2015 WL 4644398 (Vt. July 1, 2015) (unpub. mem.), https://www.vermontjudiciary.org/LC/unpublishedeo.aspx. In that case, we rejected J.P.'s assertion that the evidence was insufficient to support the court's finding that he posed a danger of harm to others, and affirmed the trial court's decision that J.P. was a "patient in need of further treatment" under 18 V.S.A. § 7107(16). We note that a "patient in need of further treatment" is defined in relevant part as a "person in need of treatment." 18 V.S.A. § 7107(16)(A).

the floor of her home with her hands tied behind her back, surrounded by a considerable amount of blood. The police observed that the rope used to bind Ms. Smith's hands was multi-colored and tied in a distinctive knot. Police also observed a distinctive shoe pattern in the blood on the kitchen and bathroom floor. A medical examiner determined that Ms. Smith's death was caused by large, very deep incision wounds to the neck that cut through the trachea, the jugular vein, and the carotid artery. Ms. Smith worked at the Howard Center in Burlington, and was a friend of Sharon Fialco, the mother of J.P.'s youngest child. The police investigation led to J.P., who was found hiding in a barn not far from Smith's abandoned vehicle. J.P. was in possession of a knife, which later forensic testing revealed had Smith's blood under the handle; a piece of rope that matched the type used to bind Smith's hands; and a Howard Center first-aid kit. The tread design on his shoes also appeared similar to that in the photos of the murder scene.

A board certified forensic psychiatrist, Dr. John Molloy, who evaluated J.P. before trial, concluded that J.P. suffered from a major mental illness, "delusional disorder-persecutory type," which results in false and delusional beliefs that others are conspiring against him. Initially, the primary object of J.P.'s delusional beliefs involved J.P.'s relationship with Ms. Fialco. These delusions include the belief that relatives of the mother and individuals associated with her are monitoring his actions in order to gather information that could impact his relationship with his daughter, including attempts to deprive him of contact.

After more than thirty hours of interviews with J.P. over a two-year period, Dr. Malloy found it apparent that the scope of J.P.'s conspiracy beliefs had grown to include his attorneys, the prosecution, and Dr. Malloy, as well as the court system itself. J.P. had written letters to the court and to Dr. Malloy that in Dr. Malloy's opinion demonstrated J.P.'s increasing delusional thoughts, especially in the nature of referential delusions. The court cited several examples of this. The court also noted that in the course of being interviewed by Dr. Malloy, J.P. described an earlier dispute that involved another woman, the mother of his oldest child. J.P. told Dr. Malloy that when he became frustrated by his inability to locate this woman, it occurred to him that he could restrain her attorney until the attorney told J.P. where the mother and child were located. Although J.P. did not act on this thinking, in Dr. Malloy's opinion it demonstrated the risk of harm that J.P. represents to others who he perceives as being opposed to his interests. Finally, the court cited an incident that occurred in 2009 or 2010 between J.P. and a woman he was dating. This incident reinforced Dr. Malloy's opinion of the connection between the conspiratorial delusions that are symptomatic of J.P.'s mental illness and the danger that he presents to others who he perceives are part of that conspiracy -even those without any apparent connection to Ms. Fialco or the child. As reported to Dr. Malloy, the young woman told the police that J.P. woke her in the middle of the night, accused her of being part of the conspiracy against him, and tried to restrain her with handcuffs and a Taser device but was not successful.

Based on all of the foregoing, Dr. Malloy concluded that J.P. suffers from a major mental illness; that he is a person in need of treatment because the mental illness has a significant impact on his behavior, his judgment, and his ability to interact safely with others; and therefore, he represents a danger to others. In Dr. Malloy's opinion, although J.P. has not been convicted in the death of Ms. Smith, there was substantial evidence of a connection between his mental illness and her death. His paranoid delusions increased his risk of violence, and the lack of negative symptoms associated with the illness increased the risk of violence even further. Dr. Malloy indicated that J.P. is very emotionally involved in his delusional beliefs, is fixed in those beliefs,

has demonstrated the ability to plan and to carry out a plan based on those beliefs, and those beliefs have become even more entrenched during the time Dr. Malloy has been interacting with him.

As the court explained, in order to involuntarily hospitalize a defendant, it "must find that defendant is 'a person in need of treatment.' " State v. Zorn, 2013 VT 65, ¶ 17, 195 Vt. 381 (citing 13 V.S.A. § 4822(a)). A "person in need of treatment" is defined as "a person who is suffering from mental illness and, as a result . . . poses a danger of harm . . . to others." 18 V.S.A. § 7101(17). Based on the findings above, the court concluded that the State had shown by clear and convincing evidence that J.P. suffered from a mental illness, and that he presented a danger of harm to others as a result of his mental illness.

The court explained that Dr. Malloy's testimony clearly demonstrated that J.P. suffered from a mental illness, specifically, a "delusional disorder-persecutory type" that substantially impacted his life. This disorder causes J.P. to experience paranoia and delusions; he perceives a conspiracy against him, involving his ex-girlfriend and her family and acquaintances, the court, Dr. Malloy, the prosecutor's office, the police department, and others. The disorder impairs J.P.'s thoughts, conduct of life, his ability to care for day-to-day needs, and results in a belief that people in the community are monitoring him. Although Dr. Malloy last met with J.P. in August 2013, his opinion was based on approximately thirty-one hours of evaluation with J.P. from May through August 2012 and June through August 2013. At their last meeting, J.P. indicated to Dr. Malloy that he would not be meeting with him any further, and Dr. Malloy credibly testified that an additional meeting with J.P. at this point would not be helpful to his opinion.

The court also found that the evidence patently demonstrated that J.P. posed a danger of harm to others. See id. § 7101(17)(A)(i), (ii) (providing that State may show a "danger of harm to others" by establishing that person "has inflicted or attempted to inflict bodily harm on another" or that "by his . . . threats or actions he . . . has placed others in reasonable fear of physical harm to themselves"). Specifically, J.P. inflicted bodily harm on another by causing the death of Ms. Smith in October 2010. Ms. Smith's car was located approximately three to five miles from where J.P. was later found in Middlebury. He was found in possession of a fixed-blade knife that had Ms. Smith's blood on it. The court cited the gruesome nature of the murder. The court found that the evidence clearly and convincingly demonstrated that J.P. killed Ms. Smith. The court noted that Dr. Malloy's testimony provided further support for the conclusion that J.P. poses a danger of harm to others. Dr. Malloy's opinion, based on his evaluation and interactions with J.P. and other information reasonably relied upon by experts in his field, and as discussed in the court's findings, was that J.P. represents a danger to others.

Finally, the court found a clear causal connection between J.P.'s mental illness and the conclusion that he is dangerous to others. Defendant suggested that there was no link, but the court strongly disagreed with that contention and was unpersuaded by defendant's attempt to distinguish his case from Zorn. As in Zorn, the court concluded, the evidence here "directly tie[s] [J.P.'s] violent behavior to his mental illness," and provides a "sufficient basis for the court to find the causal connection." Zorn, 2013 VT 65, ¶ 23. The court cited Dr. Malloy's testimony that J.P. is very emotionally engaged in his beliefs regarding the perceived conspiracy against him, a conspiracy that appears to be very similar in nature to that in Zorn. Additionally, despite J.P.'s diagnosed mental disorder, he lacks negative symptoms, which makes him a greater risk to

3

the public.  For example, Dr. Malloy found no evidence that J.P. suffered from a depressive disorder, and his mood is relatively stable.  Given this, the court found that J.P. was more likely to be able to plan and carry out particular acts.

Dr. Malloy testified that J.P. posed a danger of harm to others, especially to anyone involved in his conspiratorial delusions, which stemmed from the issue of his contact with Ms. Fialco's child.  The court found that Ms. Smith's friendship with Ms. Fialco appeared to have drawn her into the wide range of people who J.P. perceived as part of the conspiracies against him, and who are in danger as a result of J.P.'s delusional conspiracies.  The evidence also indicated that J.P. posed a danger to people without any apparent connection to Ms. Fialco or the child, citing as an example J.P.'s attempt to restrain a young woman he was dating in 2009 or 2010.  Dr. Malloy further testified that, in his medical opinion, there was no less restrictive alternative for J.P. than psychiatric treatment requiring involuntary hospitalization, and that J.P. was more likely to be violent if he was allowed out into the community.

The court thus found that the evidence clearly and convincingly showed that, as a result of J.P.'s delusional disorder-persecutory type, his "capacity to exercise self-control, judgment or discretion in the conduct of his affairs and social relations is so lessened that he . . . poses a danger of harm . . . to others."  18 V.S.A. § 7101(17).  In Dr. Malloy's opinion, there is substantial evidence of a connection between J.P.'s mental illness and Ms. Smith's death.  To any extent that Dr. Malloy did not explicitly testify to a clear causal link between J.P.'s mental illness and his act of killing Ms. Smith, the court reasonably inferred such a causal connection from its factual findings.  Thus, because J.P. was "a person in need of treatment," the court committed J.P. to the custody of the Commissioner of Mental Health for ninety days.  This appeal followed.

J.P. argues that this case is not moot even though the order on appeal has expired.  He bases this argument in part on the fact that he faces negative collateral consequences as a result of the court's decision.  Assuming he prevails on this point, J.P. maintains that the court's finding that he posed a danger of harm to himself or others is not supported by the evidence.  J.P. argues that the court must find that he poses a present danger of harm to himself or others, and that evidence relating to his alleged murder of Ms. Smith in 2010 is insufficient.  J.P. also asserts that the court erred in finding a nexus between his mental illness and his alleged murder of Ms. Smith.

As set forth above, "a person in need of treatment" is defined as:

> a person who has a mental illness and, as a result of that mental illness, his . . . capacity to exercise self-control, judgment, or discretion in the conduct of his or her affairs and social relations is so lessened that he . . . poses a danger of harm to himself . . . or to others.

The State may show a "danger of harm to others" by establishing that the person "has inflicted or attempted to inflict bodily harm on another" or that "by his . . . threats or actions he . . . has placed others in reasonable fear of physical harm to themselves."  Id. § 7101(17)(A)(i), (ii).

The State has the burden of proving its case by clear and convincing evidence. Id. § 7616(b). "Even where the standard of proof is clear and convincing evidence, we will uphold trial court findings as long as there is substantial evidence to support them although they are contradicted by credible evidence." In re N.H., 168 Vt. 508, 512-13 (1998) (citation omitted). It is for the trial court to assess the credibility of the witnesses and weigh the evidence. Id. "The test on review is not whether this Court is persuaded that there was clear and convincing evidence, but whether the factfinder could reasonably have concluded that the required factual predicate was highly probable." Id.

We agree with J.P. that this case is not moot. We considered and rejected a similar mootness argument in State v. J.S., 174 Vt. 619, 620 (2002) (mem.). In that case, as here, the State argued that the appellant's claims on appeal were moot due to a subsequent commitment order issued after the expiration of the court's original ninety day commitment order. We explained that "[a]n exception to the mootness doctrine exists when negative collateral consequences are likely to result from the action being reviewed." Id. at 620. "In mental health commitment cases, negative collateral consequences can apply because the legal disabilities radiating from the label of mentally incompetent are myriad." Id. (citation omitted). As in J.S., we conclude that "despite appellant's continued hospitalization under an order for continued treatment, the negative collateral consequences of being initially adjudicated mentally ill and then involuntarily hospitalized may continue to plague appellant with both legal disabilities and social stigmatization." Id. Although we decline to dismiss the appeal as moot, we reject J.P.'s challenges to the merits of the trial court's decision.

We begin with J.P.'s assertion that the court erred in finding that he poses a danger of harm to others. J.P. cites J.S., 174 Vt. at 621, ¶ 11, as recognizing that there must be proof of a "present danger of harm." We stated in that case that "[t]o establish proof of present danger, the court must make factual findings as to whether [the defendant] pose[s] 'a danger of harm to himself or others.'" Id. (quotation omitted). Thus, the statutory language controls.

In this case, the State showed a "danger of harm to others" by establishing both that J.P. "has inflicted . . . bodily harm on another" and that "by his . . . threats or actions he . . . has placed others in reasonable fear of physical harm to themselves." Id. § 7101(17)(A)(i), (ii). The court found clear and convincing evidence that J.P. murdered Ms. Smith, which squarely fits within the statutory language above. The fact that the murder occurred in 2010 does not mean that J.P. is no longer dangerous. The brutal murder of Ms. Smith was not that remote in time, and this hospitalization hearing came immediately after J.P. was declared incompetent to stand trial for Ms. Smith's murder, among other charges. There was also evidence to show that J.P.'s mental illness posed risks to others. As Dr. Malloy opined, J.P. is very emotionally involved in his delusional beliefs, is fixed in those beliefs, has demonstrated the ability to carry out a plan based on those beliefs, and those beliefs had become even more entrenched during the time that Dr. Malloy has been interacting with him. The scope of J.P.'s conspiratorial beliefs had greatly widened. Defendant's paranoid delusions increased his risk of violence, and the lack of negative symptoms associated with his illness increased the risk of violence even further. There was evidence to show that J.P. presented a risk of harm to anyone who opposed his interests. Dr. Malloy also concluded that there was no less restrictive alternative for J.P. than psychiatric treatment requiring involuntary hospitalization, and that J.P. was more likely to be violent if he is

allowed out in the community, testimony that the court credited. There was ample evidence here to support the court's conclusion that J.P. posed a danger of harm to others.

J.P. next challenges the court's conclusion that, "<u>as a result of his mental illness</u>, [J.P.'s] capacity to exercise self-control, judgment or discretion in the conduct of his . . . affairs and social relations is so lessened that he . . . poses a danger of harm . . . to others." 18 V.S.A. § 7101(17) (emphasis added). J.P. maintains that there was no evidence that closely tied his alleged delusions to Ms. Smith's murder.

We reject this argument. As set forth above, the court credited Dr. Malloy's opinion that there was substantial evidence of a connection between J.P.'s mental illness and Ms. Smith's death. To any extent that Dr. Malloy did not explicitly testify as to a clear causal link, the court inferred one from its factual findings. These findings included evidence that J.P. was first linked to Ms. Smith's death by a telephone report from an individual who knew Ms. Smith from the community, knew Ms. Smith and Sharon Fialco were close friends, and knew J.P. for a long time. This person was aware that J.P. knew Ms. Smith through Ms. Fialco, and she contacted police because she had not seen J.P. since Ms. Smith's death was reported publicly, and that was out of character for him. She knew that there had been issues concerning J.P.'s contact with this child because she had escorted the child to supervised visits years before, and she was concerned that Ms. Smith's relationship with Ms. Fialco might be connected to J.P. While this individual believed J.P. could be a friendly and interesting person, he was also someone with an angry side, who demonstrated that anger on the street by yelling and kicking objects. Those demonstrations of anger had been occurring more frequently in recent years. Dr. Malloy also described J.P.'s delusional beliefs involving his relationship with Ms. Fialco, who was acquainted with Ms. Smith, and these delusions included the belief that individuals associated with Ms. Fialco were monitoring his actions in order to gather information that could impact his relationships with his daughter. The evidence here supports the court's conclusion that J.P. poses a danger of harm to others "as a result of his mental illness."

<u>Affirmed</u>.

BY THE COURT:

_____
John A. Dooley, Associate Justice

_____
Marilyn S. Skoglund, Associate Justice

_____
Harold E. Eaton, Jr., Associate Justice

6